Slip Op 17-132

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| ARISTOCRAFT OF AMERICA, LLC, SHANGHAI WELLS HANGER CO., LTD, HONG KONG WELLS LTD., HONG KONG) WELLS LTD. (USA), BEST FOR LESS DRY CLEANERS SUPPLY LLC, IDEAL CHEMICAL & SUPPLY COMPANY, LAUNDRY & CLEANERS SUPPLY INC., ROCKY MOUNTAIN HANGER MFG CO., ROSENBERG SUPPLY CO., LTD., and ZTN MANAGEMENT COMPANY, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | Before: Leo M. Gordon, Judge<br><br>Consol. Court No. 15-00307 |

**OPINION and ORDER**

[Final results sustained in part, and remanded in part to Commerce.]

Dated: September 28, 2017

Douglas J. Heffner and Richard P. Ferrin, Drinker Biddle & Reath LLP of Washington, DC for Plaintiff Aristocraft of America LLC.

Jonathan M. Freed, Trade Pacific PLLC of Washington, DC argued for Consolidated Plaintiffs Shanghai Wells Hanger Co., Ltd., Hong Kong Wells Ltd., Hong Kong Wells Ltd. (USA), Best For Less Dry Cleaners Supply LLC, Ideal Chemical & Supply Company, Laundry & Cleaners Supply Inc., Rocky Mountain Hanger MFG Co., Rosenberg Supply Co., Ltd., and ZTN Management Company, LLC. With him on the briefs were Robert G. Gosselink and Jarrod M. Goldfeder.

Courtney D. Enlow, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC argued for Defendant United States. With her on the briefs were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel was Henry J. Loyer, on the brief, and Jessica R. DiPietro, Attorneys, U.S. Department of Commerce, Office of the Chief Counsel for Trade Enforcement and Compliance of Washington, DC.

Gordon, Judge: This action involves the sixth administrative review conducted by the U.S. Department of Commerce ("Commerce") of the antidumping duty order covering steel wire garment hangers from the People's Republic of China ("PRC"). See Steel Wire Garment Hangers from the PRC, 80 Fed. Reg. 69,942 (Dep't of Commerce Nov. 12, 2015) (final results admin. rev.) ("Final Results"); see also Issues & Decision Memorandum for Steel Wire Garment Hangers from the PRC, A–570–918 (Dep't of Commerce Mar. 6, 2015), available at http://enforcement.trade.gov/frn/2015/1511frn/2015-28757.txt (last visited this date) ("Decision Memorandum").

Before the court are the USCIT Rule 56.2 motions for judgment on the agency record of Plaintiffs Shanghai Wells Hanger Co., Ltd., Hong Kong Wells Ltd., and Hong Kong Wells Ltd. (USA), (collectively "Shanghai Wells"); Best For Less Dry Cleaners Supply LLC, Ideal Chemical & Supply Company, Laundry & Cleaners Supply Inc., Rocky Mountain Hanger MFG Co., Rosenberg Supply Co., Ltd., and ZTN Management Company, LLC (collectively, "U.S. Distributors"); and Aristocraft of America LLC ("Aristocraft"), (together with Shanghai Wells and U.S. Distributors, "Plaintiffs"). See Rule 56.2 Mem. Supp. Mot. J. Agency R. of Pls. Shanghai Wells Hanger Co., Ltd., Hong Kong Wells Ltd., Hong Kong Wells Ltd. (USA), Best For Less Dry Cleaners Supply LLC, Ideal Chemical & Supply Company, Laundry & Cleaners Supply Inc., Rocky Mountain Hanger MFG Co., Rosenberg Supply Co., Ltd., and ZTN Management Company, LLC, ECF No. 30 ("Shanghai Wells' Br."); see also Rule 56.2 Mem. Supp. Mot. J. Agency R. of Pl. Aristocraft of America LLC, ECF No. 32 ("Aristocraft's Br.");

Def.'s Mem. Opp'n Pls.' Rule 56.2 Mot. J. Agency R., ECF No. 42 ("Def.'s Opp'n"); Pl. Aristocraft's Reply Br., ECF No. 51 ("Aristocraft's Reply"); Shanghai Wells' Reply Br., ECF No. 53 ("Shanghai Wells' Reply"). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[1] and 28 U.S.C. § 1581(c) (2012).

Plaintiffs challenge (1) Commerce's deductions of Chinese un-refunded value-added tax ("VAT") as "export tax" from the starting prices used to establish the export price and constructed export price of Shanghai Wells' subject merchandise; (2) Commerce's valuation of Shanghai Wells' corrugated paperboard input; (3) Commerce's valuation of Shanghai Wells' brokerage and handling costs; and (4) Commerce's calculation of surrogate financial ratios. The court remands the Final Results to Commerce with respect to its VAT deductions and calculation of surrogate financial ratios, and sustains the Final Results on Plaintiffs' other challenges.

## I. Standard of Review

For administrative reviews of antidumping duty orders, the court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

1345, 1350-51 (Fed. Cir. 2006); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2017). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2017).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984), governs judicial review of Commerce's interpretation of the Tariff Act. See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (An agency's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is

ambiguous."); <u>see generally</u> Harry T. Edwards & Linda A. Elliott, <u>Federal Standards of Review</u> 137-161 (2007).

## II. Discussion

### A. Value Added Tax

Plaintiffs contend that Commerce erred in calculating Shanghai Wells' export price ("EP") and constructed export price ("CEP"). The statute directs Commerce to reduce EP or CEP by "the amount, if included in such price, of any export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise to the United States . . . ." 19 U.S.C. § 1677a(c)(2)(B). Plaintiffs argue that the plain language of the term "export tax" leaves no room for agency interpretation under <u>Chevron</u>. <u>See</u> Aristocraft's Br. 2-8.  Defendant responds that Commerce properly interpreted this statutory language to allow for deductions from Shanghai Wells' EP and CEP for Chinese un-refunded value-added tax ("irrecoverable VAT") incurred on the subject wire hangers exported to the United States. Def.'s Opp'n 39-46. Plaintiffs alternatively argue that Commerce's application of its methodology was unreasonable given the administrative record (unsupported by substantial evidence). <u>See</u> Aristocraft's Br. 8-13.

As noted above, the court reviews Commerce's interpretation of the antidumping statute "within the framework established by <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984)." <u>Maverick Tube Corp. v. United States</u>, 861 F.3d 1269, 1272 (Fed. Cir. 2017) (quoting <u>Agro Dutch Indus. v. United States</u>, 508 F.3d 1024, 1029-30 (Fed. Cir. 2007)). Pursuant to this framework, the court must first determine if the statute, 19 U.S.C. § 1677a(c)(2)(B), unambiguously addresses whether

partially un-refunded VAT may be deducted from a respondent's EP or CEP as a "tax, duty, or other charge" that is imposed on the exportation of the subject merchandise. Congress has not expressed an unambiguous intent on how Commerce should resolve this issue.

Several recent cases in the U.S. Court of International Trade have addressed the issue of this particular Chinese VAT within the Chevron framework: Juancheng Kangtai Chem. Co. v. United States, 41 CIT ___, ___, 2017 WL 218910, at *11-13 (Jan. 19, 2017) ("Juancheng"); China Mfrs. Alliance, LLC v. United States, 41 CIT ___, ___, 205 F. Supp. 3d 1325, 1344-51 (2017) ("China Mfrs. Alliance"); and Jacobi Carbons AB v. United States, 41 CIT ___, ___, 222 F. Supp. 3d 1159, 1186-94 (2017) ("Jacobi Carbons"). This Court is persuaded by the Chevron analysis of Jacobi Carbons and Juancheng. The court also finds persuasive Jacobi Carbons' questioning of the reasonableness of Commerce's methodology applied to the facts in that case, and believes those same misgivings are applicable here.

To explain in more detail, Juancheng reviewed Commerce's deduction, pursuant to § 1677a(c)(2)(B), for Chinese "irrecoverable VAT" as a "charge imposed by" China "on the exportation of the subject merchandise to the United States." Juancheng, 41 CIT at ___, 2017 WL 218910, at *11. Juancheng observed that the statute does not define the phrase "export tax, duty, or other charge imposed" and concluded that because Congress had not spoken to the precise question at issue, Chevron step one was inapplicable. Id. Under the second prong of Chevron the court analyzed whether the statutory language "'export tax, duty, or other charges' [could permissibly include] 'a cost

that arises as the result of export sales.'" Id. (citing Final Results of Redetermination Pursuant to Court Remand, Consol. Court No. 14–00056, ECF No. 81–1 (Apr. 15, 2016) regarding Chlorinated Isocyanurates from the PRC, 79 Fed. Reg. 4875 (Dep't of Commerce Jan. 30, 2014), and accompanying issues and decision memorandum (Jan. 22, 2014), available at http://enforcement.trade.gov/frn/summary/prc/2014-01898-1.pdf ("Juancheng Remand Results")).

Specifically, the court in Juancheng noted that the statute included the broad catchall term "other charges" that could reasonably include an irrecoverable VAT, and further explained that Commerce's interpretation was in accord with precedent from the U.S. Court of Appeals for the Federal Circuit interpreting the term "charges." Juancheng, 41 CIT at ___, 2017 WL 218910, at *11 (citing Shell Oil Co. v. United States, 751 F.3d 1282, 1291-92 (Fed. Cir. 2014)). The court also observed that when Commerce found irrecoverable VAT to "arise as the result of export sales, Commerce also reasonably interpreted the requirement that the cost be 'imposed . . . on the exportation of the subject merchandise to the United States,' [such that the cost] 'arises solely from, and is specific to, exports.'" Id. (citing Juancheng Remand Results as well as § 1677a(c)(2)(B) (internal citations omitted)). Having determined that Commerce reasonably interpreted § 1677a(c)(2)(B) to deduct an amount for irrecoverable VAT as a "charge imposed by the exporting country on the exportation of the subject merchandise to the United States," the court in Juancheng ultimately concluded that Commerce had not, on that administrative record, unreasonably overstated the amount of irrecoverable VAT given its calculation of a fixed eight percent rate for the subject merchandise. Juancheng therefore

sustained Commerce's remand determination for the deduction of irrecoverable VAT.
Id., 41 CIT at ___, 2017 WL 218910, at *13-14.

In China Manufacturers Alliance the court reviewed Commerce's deduction
pursuant to § 1677a(c)(2)(B) for respondent Guizhou Tyre Co., Ltd. ("GTC") "for what it
considered to be Chinese un-refunded value-added tax ('VAT') incurred on the subject
tires that GTC exported to the United States." China Mfrs. Alliance, 41 CIT at ___, 205 F.
Supp. 3d at 1344. Commerce characterized the irrecoverable VAT as "'a net VAT burden
that arises solely from, and is specific to, exports' and 'is VAT paid on inputs and raw
materials (used in the production of exports) that is nonrefundable and, therefore, a cost.'"
Id. (quoting Issues and Decision Memorandum for Final Results of Antidumping Duty
Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's
Republic of China, A–570–912 (Dep't of Commerce Apr. 8, 2015), at 28).

China Manufacturers Alliance held that Commerce's determination was unlawful
under Chevron step one because Commerce failed to find that a specific "amount" of an
"export tax, duty, or other charge" was "imposed" by China. China Mfrs. Alliance, 41 CIT
at ___, 205 F. Supp. 3d at 1346. The court explained:

> Instead of finding as a fact that the PRC imposed a tax, duty, or charge—of
> whatever character—in an amount equivalent to 8% of the FOB value of
> GTC's subject merchandise, Commerce applied a presumption that goods
> exported from China are subject to "irrecoverable VAT" in the amount of 8%
> of the FOB value of the exported good.

Id. The court further explained that "Commerce substituted a presumption—whether
rebuttable or irrebuttable—for an actual finding" and in so doing violated § 1677a(c)(2)(B).
Id., 41 CIT at ___, 205 F. Supp. 3d at 1351. The court opined that "[g]eneralized

conclusions about China's VAT scheme do not suffice. Commerce may not reduce the starting price by a fixed percentage—no matter how derived—that is not the actual amount of a tax, duty, or other charge that the exporting country is found in fact to have imposed." Id.

The court, in effect, read § 1677a(c)(2)(B) as forbidding approximations derived from percentages, and requiring Commerce to make a distinct finding of a specific "amount" in each case in which Commerce assesses irrecoverable VAT as a deductible export tax. This differed from Juancheng, as well as an earlier decision, Fushun Jinly Petrochemical Carbon Co. v. United States, 40 CIT ___, 2016 WL 1170876 (Mar. 23, 2016), which did not interpret the statute to require such an express obligation. Fushun Jinly and Juancheng instead held that § 1677a(c)(2)(B) broadly affords Commerce discretion to calculate deductions for an "export tax, duty, or other charge," and sustained Commerce's deductions for irrecoverable VAT.

In Jacobi Carbons the court reviewed Commerce's adjustments for irrevocable VAT pursuant to § 1677a(c)(2)(B) for respondents Jacobi Carbons AB and Jacobi Carbons, Inc. (together, "Jacobi"). See Jacobi Carbons, 41 CIT at ___, 222 F. Supp. 3d at 1186-88. The court in Jacobi Carbons meticulously explained Commerce's formula for calculating irrecoverable VAT and addressed Jacobi's arguments that irrecoverable VAT could not be interpreted as an "export tax or other charge" under the statute. Id. Jacobi Carbons followed Fushun Jinly's legal analysis (offering a somewhat more expansive explanation of § 1677a(c)(2)(B) than Juancheng), and concluded that Commerce reasonably interpreted the vague language of § 1677a(c)(2)(B) to deduct

irrecoverable VAT from respondents' CEP as a charge "imposed by the exporting country on the exportation of merchandise." Id.

To provide some additional context and background, the court notes that Commerce announced it would begin making § 1677a(c)(2)(B) deductions from EP or CEP for goods exported from non-market economy countries in its Methodological Change for Implementation of Section 772(c)(2)(B)[2] of the Tariff Act of 1930, as amended, In Certain Non–Market Economy Antidumping Proceedings, 77 Fed. Reg. 36,481, 36,482-83 (Dep't of Commerce June 19, 2012) ("Methodological Change"). The Decision Memorandum states that "[w]here the irrecoverable VAT is a fixed percentage of U.S. price, the Department explained [in the Methodological Change] that the final step in arriving at a tax-neutral dumping comparison is to reduce the U.S. price downward by this same percentage." Decision Memorandum at 12. Jacobi Carbons explained how this methodology reasonably interpreted vague language in § 1677a(c)(2)(B), including the requirement that such taxes or other charges be "imposed" by the exporting country. See Jacobi Carbons, 41 CIT at ___, 222 F. Supp. 3d at 1187-88 (determining that Commerce's interpretation as implemented through the Methodological Change was reasonable given the plain meaning of the term "imposed" used in the statute).

Aristocraft challenges Commerce's interpretation of the statutory language by arguing that Commerce's definition of "irrecoverable VAT" is simply a tautology to meet the statutory requirements for a price deduction and not a real cost imposed under

_____

[2] 19 U.S.C. § 1677a(c)(2)(B).

Chinese law. See Aristocraft's Br. 6-8. Aristocraft argues that Commerce invented the term "irrecoverable VAT" that is found nowhere in Chinese law. Aristocraft does, however, acknowledge that Shanghai Wells "pays [VAT] for its domestic purchases of inputs used to produce the hangers" on export sales, and this VAT would ordinarily be refunded if the same subject merchandise was sold in a domestic sale. Id. at 8. Aristocraft recognizes that this is a cost, but characterizes it as an "internal tax" that cannot reasonably be described as being "imposed" on exportation. Id.

The court disagrees. It is reasonable to describe an input VAT not fully recouped on export sales as a cost imposed on the exportation of the subject merchandise. See Jacobi Carbons, 41 CIT at ___, 222 F. Supp. 3d at 1186-88. Commerce identified this cost-in-fact resulting from the operation of Chinese law under the term "irrecoverable VAT." See Decision Memorandum at 12-13. Commerce defines irrecoverable VAT as "a cost that arises as the result of export sales." Id. at 13. "Because the Chinese VAT is refunded in the context of domestic sales but not exports, it constitutes a 'penalty' that is 'applied,' and with which [respondent] is forever 'burdened,' at the time of exportation." See Jacobi Carbons, 41 CIT at ___, 222 F. Supp. 3d at 1188. Commerce reasonably concluded that the phrase "export tax, duty, or other charge imposed by the exporting country on the exportation," 19 U.S.C. § 1677a(c)(2)(B), could be read to include such a cost.

There remains the issue of whether Commerce's calculation of the amount of irrecoverable VAT to deduct is reasonable given the administrative record (supported by substantial evidence). See Aristocraft's Br. 8-12. The court concludes that here, as in

Jacobi Carbons, 41 CIT at ___, 222 F. Supp. 3d at 1188-94, Commerce has failed to demonstrate that its calculation of an eight percent irrecoverable VAT deduction from the Shanghai Wells' EP and CEP was reasonable (supported by substantial evidence).

Commerce prefaces its analysis by explaining that under Chinese law irrecoverable VAT is comprised of "some portion of the input VAT that a company pays on purchases of inputs used in the production of exports [that] is not refunded." Decision Memorandum at 12; see also id. at 13 (irrecoverable VAT "is VAT paid on inputs and raw materials (used in the production of exports)"). Commerce also concludes that under Chinese law "the standard VAT levy is 17 percent and the rebate rate for subject merchandise is nine percent." Id. at 14. Commerce though fails to explain how in light of its definition of "irrecoverable VAT" a reasonable mind could find that Shanghai Wells incurred an irrecoverable VAT charge in the amount of eight percent of the value of the subject exports.

A simplified example illustrates the problem. Starting with Commerce's two conclusions about Chinese VAT, a subject wire hanger exported from China to the United States with an FOB export value of $1 (to take a round number) would contain "inputs and raw materials" that were subject to VAT at the rate of 17% applicable to those inputs and raw materials, and the exportation of the hanger would have qualified Shanghai Wells for a VAT rebate of $0.09. For Shanghai Wells to have incurred a "tax, duty, or other charge," of un-refunded VAT, of $0.08 (in accordance with Commerce's conclusion that the irrecoverable VAT was eight percent of export value), the actual VAT imposed on the "inputs and raw materials" used in the production of the hanger would have to have been

$0.17, i.e., the $0.09 in refunded VAT plus the $0.08 in un-refunded VAT. But for the VAT on the inputs and raw materials to have been $0.17, those VAT-subject inputs and raw materials would have had to have been valued at $1, which was the entire FOB value of the exported hanger. The FOB export values could have included no other costs (for example, no cost of labor, no factory overhead, no selling, general, administrative, or any other expenses), and no profit. See generally Aristocraft's Br. 10-11 (citing a similar simplified example provided in its administrative case brief that Commerce did not directly address).

Commerce's conclusion that Shanghai Wells incurred a net VAT charge of eight percent on the value of its subject exported hangers implies that the 17% standard VAT levy was applied to the entire FOB export value of the hanger, and not to the VAT-subject inputs and raw materials used in production. Cf. Def.'s Opp'n 44-45 (arguing, for what appears to be the first time, that the 17 percent VAT rate used in Commerce's calculation was applied to the "total export sales value"). This breakdown of the formula contradicts Commerce's conclusion that the VAT was "paid on inputs and raw materials (used in the production of exports)." Decision Memorandum at 13.

As in Jacobi Carbons, the Decision Memorandum in this case offers no explanation to resolve the apparent contradiction, and the court cannot understand how a reasonable mind could follow Commerce's stated methodology and arrive at the net VAT charge of eight percent. See Jacobi Carbons, 41 CIT at ___, 222 F. Supp. 3d at 1193-94 (noting that Commerce could not explain its reasoning for the same contradiction, and remanding for

further explanation). The court therefore remands this issue to Commerce for further explanation and, if appropriate, reconsideration.

### B. Corrugated Paper

Plaintiffs challenge Commerce's surrogate valuation of Shanghai Wells' corrugated paper input, arguing that Commerce's use of average unit values ("AUV") from Global Trade Atlas ("GTA") Thai import statistics for HTS code 4808.10 ("Corrugated Paper and Paperboard, Whether or Not Perforated") for the period of review resulted in the selection of an aberrationally high surrogate value that significantly distorted the final antidumping duty margin calculated for Plaintiffs. See Shanghai Wells' Br. 18-19. For the reasons explained below, the court sustains Commerce's use of this surrogate dataset.

The statute "directs Commerce to value the factors of production 'based on the best available information regarding the values of such factors in a market economy country.' 19 U.S.C. § 1677b(c)(1)(B) (emphasis added)." Downhole Pipe & Equipment, L.P. v. United States, 776 F.3d 1369, 1375 (Fed. Cir. 2015). "The term 'best available' is one of comparison, i.e., the statute requires Commerce to select, from the information before it, the best data for calculating an accurate dumping margin. . . . This 'best' choice is ascertained by examining and comparing the advantages and disadvantages of using certain data as opposed to other data." Dorbest Ltd. v. United States, 30 CIT 1671, 1675, 462 F. Supp. 2d 1262, 1268 (2006). The "burden of creating an adequate record lies with [interested parties] and not with Commerce." QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011); see also Nan Ya Plastics Corp. v. United States, 810 F.3d 1333, 1337-38 (Fed. Cir. 2016) (same); Jacobi Carbons AB v. United States, 619 F. App'x

992, 996 (Fed. Cir. 2015) (same).

During the administrative proceeding Plaintiffs argued that the Thai AUV were aberrational. Commerce, in turn, explained that it analyzes whether surrogate data are aberrational by comparing "the GTA import data at issue [with] GTA data from the other potential surrogate countries at a comparable level of economic development to that of the NME for a given case." Decision Memorandum at 16. Commerce also noted that neither Plaintiffs nor any other party "placed GTA import data for comparable countries on the record of this review." Id. As a consequence, Commerce did not evaluate whether the Thai dataset might be aberrational in some other sense. Importantly, Plaintiffs do not challenge Commerce's practice of measuring possible aberrations in a dataset only against other surrogate data from economically comparable countries. Plaintiffs instead lodge a facial attack on the quality of the Thai dataset Commerce used, arguing to the court that Commerce should have independently sought out better data. See Shanghai Wells' Br. 20-21. This is a risky litigation position because, as noted, although Commerce may help develop the administrative record, the burden to develop it ultimately rests with interested parties like Plaintiffs. See QVD Food Co., 658 F.3d at 1324 ("Although Commerce has authority to place documents in the administrative record that it deems relevant, the burden of creating an adequate record lies with [interested parties] and not with Commerce." (internal quotations omitted)). Also, when an interested party had the opportunity during the administrative proceeding to develop the record and submit data, the court may not subsequently order Commerce to open the record to allow that interested party a second chance to submit data. See Essar Steel Ltd. v. United States,

678 F.3d 1268, 1278 (Fed. Cir. 2012) (explaining that it is plaintiffs' burden to timely submit relevant information to the record and holding that the courts may not order Commerce to reopen the record to admit evidence that plaintiffs failed to submit during the administrative proceeding). When Plaintiffs argue that Commerce should have done more, they unwittingly concede that they did too little. It is too easy to sit back and criticize the quality of a particular surrogate dataset in isolation; it is more difficult to have to defend the merits of one's own proffered surrogate dataset as the only dataset that a reasonable mind would choose as the best available on the record.

The problem here is that Plaintiffs did too little, and their arguments to the court facially attacking the Thai surrogate dataset in an absolute, as opposed to relative, sense, misunderstand the "best available" statutory requirement. The court does not evaluate whether the information Commerce used was the best available in some absolute sense, "'but rather whether a reasonable mind could conclude that Commerce <u>chose</u> the best available information.'" <u>Zhejiang DunAn Hetian Metal Co. v. United States</u>, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (quoting <u>Goldlink Indus. Co. v. United States</u>, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006) (emphasis added)).

Plaintiffs below argued that Commerce should have used fourth administrative review Thai data with a multiplier to account for inflation. <u>See</u> U.S. Distributors' Case Brief at 17-19, 28-29, PD 166 at bar code 3300332-01 (Aug. 24, 2015) (suggesting Commerce inflate the surrogate value for corrugated paper from the fourth review for the sixth review); Shanghai Wells' Br. 17-27 (challenging Commerce's selected Thai AUV for corrugated paper without suggesting any reasonable alternatives, arguing that

Commerce should have provided comparable GTA import data on the record or used benchmark data from the U.S. to "corroborate" the aberrational nature of the selected data). Now before the court Plaintiffs have abandoned their proffered dataset, choosing not to argue <u>at all</u> about the relative merits of their proffered alternative against the dataset Commerce used. What they do instead is attempt a simple facial attack on the Thai data Commerce used, coupled with a request that the court order Commerce to obtain better data. That argument is ultimately not responsive to the "best available" statutory standard, and accordingly the court sustains Commerce's use of the Thai surrogate dataset to value the corrugated paper input.

### C. Brokerage & Handling

Plaintiffs challenge Commerce's surrogate value determination of Shanghai Wells' brokerage and handling ("B&H") costs, asserting that Commerce inappropriately relied upon the World Bank's "<u>Doing Business 2015: Thailand</u>" publication ("<u>Doing Business</u>") instead of using allegedly more specific and accurate brokerage rate information from two global shipping companies that Shanghai Wells placed on the record. <u>See</u> Shanghai Wells' Br. at 17. Separately, Plaintiffs contend that Commerce overstated the numerator and understated the denominator in its calculation of the B&H surrogate value. <u>Id.</u>

The court has repeatedly affirmed Commerce's use of World Bank data as a reliable and accurate source to value B&H, and does so again here. <u>See, e.g.</u>, <u>Yingqing v. United States</u>, 40 CIT ___, ___, 195 F. Supp. 3d 1299, 1311-12 (2016) (detailing prior affirmations of Commerce's use of the World Bank Doing Business report, and again affirming its use as a more "suitable surrogate data source for steel wire garment hangers"

than the alternative posed by plaintiffs); Foshan Shunde Yongjian Housewares & Hardwares Co. v. United States, 40 CIT ___, 172 F. Supp. 3d 1353 (2016) (affirming Commerce's use of World Bank Doing Business report to value B & H); Since Hardware (Guangzhou) Co. v. United States, 37 CIT ___, ___, 911 F. Supp. 2d 1362, 1377 (2013) (affirming Commerce's reliance on World Bank Doing Business report and noting that the report is a "reliable and accurate source").

Plaintiffs argue that instead of relying on the broad and unspecific information in the Doing Business report, Commerce should have used the average of actual export brokerage rates from two Thai shipping container lines that were placed on the record. See Decision Memorandum at 18; Shanghai Wells' Br. 31-33. Commerce rejected these alternative sources, finding that they provided only price quotes instead of actual expenses. Decision Memorandum at 19-20. Moreover, Commerce noted its express preference for using "broad market averages" over such individualized price quotes, reasonably explaining that reliance on limited data from only two Thai shipping companies would be inferior to using the "broad market averages" provided by the wealth of data relating to various Thai businesses' B&H information available in the Doing Business report. Id. at 20. Commerce's explanation and determination are reasonable given its stated preference to use "broad market averages" for B&H surrogate value calculations. Decision Memorandum at 20. The court therefore sustains Commerce's selection of the Doing Business data as the "best available information" on the record to value Shanghai Wells' B&H costs. 19 U.S.C. § 1677b(c).

Commerce calculated surrogate B&H costs from the <u>Doing Business</u> report as follows:

| | |
|---|---|
| Documents preparation | US $175 |
| +Customs clearance and technical control | US $50 |
| +Ports and terminal handling | US $160 |
| -Letter of credit fee (excluded) | (US $60) |
| TOTAL | US $325 |

<u>See</u> Shanghai Wells' Br. 28. During the administrative proceeding, Shanghai Wells placed on the record information to confirm that the specific amount ($60) of the costs of obtaining a letter of credit in Thailand assumed in the 2015 <u>Doing Business</u> report. <u>See</u> Decision Memorandum at 21 & n.155 (citing Ningbo Dasheng's Surrogate Value Submission, Ex. SV-9, PD[3] 115 at barcode 3274160-02 (May 4, 2015)). Commerce accordingly deducted out this fee upon Shanghai Wells' provision of proof that it did not incur such expenses. <u>Id.</u> Plaintiffs argue that Commerce should have made further adjustments to the total surrogate B&H calculation to include deductions for other expenses not incurred by Shanghai Wells that remain in the "Documents preparation" category of the <u>Doing Business</u> report. <u>See</u> Shanghai Wells' Br. 28-31. Plaintiffs note that Shanghai Wells provided record evidence that it did not incur the full amount of fees included in the "Documents preparation," and thus should have had this amount reduced for expenses relating to the creation of commercial invoices, bills of lading, or certificates of origin. <u>Id.</u> Commerce does not dispute this information, but maintains that it properly assessed B&H expenses in the full amount (minus the letter of credit fee previously

---

[3] "PD ___" refers to a document contained in the public administrative record.

addressed) because the <u>Doing Business</u> report did not clearly identify or break-down which costs were associated with which documents in the "Documents preparation" category. <u>See</u> Def.'s Resp. 35.  Commerce maintains that it may reasonably rely on the <u>Doing Business</u> reported B&H values without "going behind the data" unless Shanghai Wells can establish a precise breakdown of which costs they did not incur and what segment of the $115 document preparation cost is attributable to those specific costs. <u>Id.</u> at 35-36. The court agrees.

        As explained in <u>Foshan Shunde Yongjian Housewares & Hardwares Co.</u>, "[t]he document preparation component of the <u>Doing Business</u> data point is an aggregate figure that includes costs for the preparation of numerous documents." 40 CIT at ___, 172 F. Supp. 3d at 1360. Where Plaintiffs fail to identify an "exact breakdown of the data included in the World Bank report, and how the business practices of this broad pool of companies relate to the business practices of [Plaintiffs], [Commerce] can no more deduct a letter of credit expense, or remove elements of document and preparation charges, than it can add extra expenses which [Plaintiffs] incurred but which are not reflected by the World Bank data." <u>Id.</u> (citation omitted). Given that Plaintiffs in this action did not make such specific identifications (other than the $60 value for the letter of credit fee), the court will sustain as reasonable Commerce's refusal to make further adjustments to the B&H "documents preparation" line item from the <u>Doing Business</u> report.

        Beyond challenging the source of the surrogate value figures Commerce used to calculate B&H, Plaintiffs also maintain that Commerce improperly applied a methodology that assumed that B&H charges would vary depending on the weight of the shipments of

the subject merchandise. <u>See</u> Shanghai Wells' Br. 33-35. In calculating Shanghai Wells' B&H surrogate value, Commerce divided the B&H of $325 costs per shipment by an assumed denominator of 10,000 kg for a 20-foot container to obtain a per kilogram value for surrogate B&H costs. <u>See</u> <u>Decision Memorandum</u> at 17-21 (discussing comments on Commerce's B&H calculation). Plaintiffs assert that Commerce failed to reasonably explain its assumed denominator, specifically, why B&H expenses would change depending on shipment weight. <u>See</u> Shanghai Wells' Br. 33-35. Plaintiffs contend that Commerce's adjustments to Shanghai Wells' calculated B&H costs based upon assumed shipment weights inappropriately overstated the calculated surrogate value for B&H, using an assumed shipment weight of 10,000 kg per container rather than Shanghai Wells' actual average weight of shipments on the record. <u>Id.</u>

Plaintiffs' argument has some superficial appeal given that the <u>Doing Business</u> report does contain language suggesting that B&H costs are not directly tied to container weight. Plaintiffs, nevertheless, undercut their argument by failing to propose a reasonable alternative calculation that does not depend on container weight. They propose only that Commerce use more specific weight figures in the existing B&H calculation methodology. <u>See</u> <u>id.</u> The court surmises that this may be because the record evidence indicates that Shanghai Wells did in fact ship single 20-foot containers, which both the <u>Doing Business</u> publication and Commerce's methodology presume. <u>See, e.g.,</u> U.S. Distributors' Case Brief at 34, PD 166 at bar code 3300332-01 (Aug. 24, 2015). This fact (that Plaintiffs ship in 20 foot containers) distinguishes the cases Plaintiffs rely upon because those cases involved challenges to Commerce's underlying assumptions

about how the respondents shipped their goods. See, e.g., DuPont Teijin Films China Ltd. v. United States, 38 CIT ___, ___, 7 F. Supp. 3d 1338, 1351-52 (2014) (remanding B&H issue to Commerce where plaintiff's method of shipping multiple containers per shipment rendered illogical Commerce's assumption that B&H costs increased proportionally to shipment weight or size); CS Wind Vietnam Co. v. United States, 38 CIT ___, ___, 971 F. Supp. 2d 1271, 1294 (2014) (remanding same issue where record indicated that plaintiff shipped its goods in segments in a "pyramid fashion" on the ship, without containers).

Commerce reasonably explained that it selected the denominator of 10,000 kg per container to preserve the internal consistency of a surrogate B&H calculation using Doing Business figures that were calculated using 10,000 kg as the assumed container weight. See Decision Memorandum at 20. Rather than argue that Commerce's practice of harmonizing its surrogate B&H calculation with the assumptions underlying the Doing Business figures was unreasonable, Plaintiffs challenge the more fundamental assumption that B&H costs and container weight have any connection. As noted, however, Plaintiffs provide no explanation as to why such an assumption is unreasonable nor do they propose any reasonable alternative. Nor do Plaintiffs argue that Shanghai Wells' shipments involve anything other than the shipment of single 20-foot containers, weighing in excess of 10 tons, upon which B&H costs are assessed. As Commerce has reasonably explained its methodology for assessing a surrogate value for B&H costs from the best available record data, and Plaintiffs have failed to demonstrate that Commerce's

methodology was unreasonable as applied to its shipping practices, the court sustains Commerce's determinations with respect to the surrogate value for B&H.

### D. Surrogate Financial Ratios

In the sixth administrative review, Commerce selected financial statements for calculating surrogate financial ratios from three Thai companies: LS Industries Co. ("LS"), Sahasilp Rivet Industrial Co. Ltd. ("Sahasilp"), and Thai Mongkol Fasteners Co., Ltd. ("Mongkol"). See Decision Memorandum at 7-10. Commerce uses financial ratios in non-market economy antidumping cases to calculate a respondent's factory overhead, selling, general and administrative expenses, and profit, which represent some of the respondent's factors of production. See Dorbest Ltd. v. United States, 30 CIT 1671, 1715 462 F. Supp. 2d 1262, 1300 (2006). Commerce must value the factors of production on "the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate." 19 U.S.C. § 1677b(c)(1). Commerce calculates surrogate financial ratios under 19 C.F.R. § 351.408(c)(4), using "non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate country." Plaintiffs challenge Commerce's selection on various grounds. See Shanghai Wells' Br. 3-17.

Plaintiffs argue: (1) Commerce erred in using Mongkol's financial statement as it included an alleged distortive and improperly translated line cost item; (2) Commerce should have additionally used financial statements from Bangkok Fastening Co., Ltd. ("Bangkok Fastening") in place of, or at least in addition to, the other financial data; and (3) Commerce erred in using financial data from Sahasilp and Mongkol, as these

companies did not produce "identical or comparable merchandise." See id.

Plaintiffs challenge Commerce's use of Mongkol's financial statement for calculation of the surrogate financial ratio because the Mongkol financial statement included a line-item, translated in petitioner's submission as "Article making cost" that Plaintiffs contend improperly inflated the company's overhead costs and distorted Commerce's financial ratio calculation. See Shanghai Wells' Br. 13-15. Plaintiffs assert that Commerce should have accepted their alternative translation of the line-item as "hire of work," according to an unnamed Thai consultant and an online Thai-to-English dictionary. Id. at 14.

Commerce explained its practice with respect to translated documents in the Decision Memorandum:

> . . . when the Department receives a translated document, it assumes it is correct unless there is a discrepancy or alternate translation. Here, respondents provided another translation for what was originally translated as "Article making cost." U.S. Distributors and Aristocraft argued that the proper translation is "Hire of work" and therefore the item should not be classified as overhead. U.S. Distributors did not provide the name or the qualifications of the person providing the translation or an affidavit from the person providing the alternate translation. U.S. Distributors stated a "local consultant" used a website to produce the translation of "Hire of work." It is not known who the local consultant is, whether that person speaks Thai, the person's qualifications, or the reliability of the website used. Therefore, because we do not have enough information to consider the alternate translation and because the other costs of sales were fully enumerated, we determine that the "Article making cost" line item is not ambiguous, and find it appropriate to continue to classify the entire line item of "Article making cost" as MOH in the surrogate financial ratio calculation.

See Decision Memorandum at 10. This is reasonable. Plaintiffs have not challenged Commerce's practice of assuming the correctness of a translated document unless a

party provides an alternate translation. And here, Plaintiffs could have better substantiated their claimed translation superiority. For example, Plaintiffs could have obtained the opinion of a Thai language expert, who could have prepared an affidavit, with authoritative Thai to English translations. The court could then more readily throw its weight behind such a translation as the only reasonable translation on the record. More likely though, Commerce would have simply acknowledged the alternate translation as correct. The court is somewhat confused that Plaintiffs believed there was any merit to this issue, after all, they are requesting the court to trust an unnamed "consultant" and random online dictionary to override the original translation. As explained, there is a better way to establish that the proffered translation is the one and only reasonable translation of the disputed term. Commerce's determination is therefore sustained.

Plaintiffs also challenge Commerce's refusal to select Bangkok Fastening's financial statement for use in calculating surrogate financial ratios. See Shanghai Wells' Br. 15-17. Commerce found that Bangkok Fastening's financial statement was insufficiently detailed to use for reliable calculation of surrogate financial ratios. See Decision Memorandum at 9. A comparison of Bangkok Fastening's financial statement with that of Sahasilp, the latter of which Commerce found sufficiently detailed for use in the surrogate financial ratio calculations, demonstrates the reasonableness of Commerce's conclusion. Compare M&B's Surrogate Value Submission at Exhibit 4 at p.2, PD 121 at bar code 3275954-03 (May 13, 2015), with FabriClean's Surrogate Value Submission at Exhibit SV-12 at p. 34, PD 124 at bar code 3275968-02 (May 13, 2015). The Sahasilp statement provides detailed breakdowns of the components of energy,

labor, and material costs, whereas the Bangkok Fastening statement provides no such comparable specificity. Id. Accordingly, the court sustains Commerce's decision to reject the Bangkok Fastening financial statement.

Plaintiffs' most persuasive argument challenges Commerce's selection of financial data from Sahasilp and Mongkol as unreasonable. Plaintiffs argue that Commerce has, in prior reviews, equated production of "comparable merchandise" with drawing wire from wire rod. Id. at 3-13. Defendant disagrees with Plaintiffs' assertion that an agency practice of relying only on data from surrogate companies that draw wire rod as part of their production practice exists. Alternatively, Defendant contends that even if such a practice existed Commerce was either not bound to follow such a practice, or that departure from such a practice occurred in the fourth administrative review and should not be reviewed in this challenge to the sixth administrative review. See Def.'s Resp. 4-16. The court agrees with Plaintiffs that Commerce failed to reasonably explain in this review its change in emphasis for a criterion it previously determined to be critical—that surrogate companies must have drawn wire from wire rod in the production process. Accordingly, the court remands the issue of surrogate financial ratio calculation to Commerce.

During the investigation Commerce concluded that "only those companies which clearly identify wire rod as a raw material can be considered adequate surrogates to calculate the surrogate financial ratios because any of these more accurately reflect the production experience of the respondents." See Steel Wire Garment Hangers from the People's Republic of China, 73 Fed. Reg. 47,587 (Dep't of Commerce Aug. 14, 2008)

("Final Results-Investigation"), and accompanying Issues and Decision Memorandum, A-570-918 (Aug. 7, 2008) ("Decision Mem.-Investigation"), at cmt. 3, available at http://enforcement.trade.gov/frn/summary/PRC/E8-18851-1.pdf (last visited on this date). That is a clear and direct statement of the importance of drawing wire rod in analyzing potential surrogate companies. And in the following three administrative reviews, Commerce solidified its stance that potential surrogate companies use wire rod in their production process. See Shanghai Wells' Br. 4-7 (citing the final results of Commerce's first three administrative reviews of the antidumping duty order covering steel wire garment hangers).

The fourth administrative review was different, with more limited options for surrogate financial statement selection, with several financial statements unusable. See Steel Wire Garment Hangers from the People's Republic of China, 79 Fed. Reg. 31,298 (Dep't of Commerce June 2, 2014) ("Final Results-AR4"), and accompanying Issues and Decision Memorandum, A-570-918 (May 27, 2014) ("Decision Mem.-AR4"), at cmt. 2, available at http://enforcement.trade.gov/frn/summary/prc/2014-12730-1.pdf (last visited on this date). As a result, Commerce selected the financial statements of one company, LS, which were the only statements with enough detailed information for Commerce to calculate financial ratios. Id. Notably, Commerce acknowledged that the record did not indicate whether LS drew wire rod or what inputs it used in its production process of nails. Id. Commerce explained that "where information as to inputs and production is on the record for a producer of comparable merchandise, such information may be useful in determining whether it is appropriate to use. However, the absence of

such information does not exclude a producer of comparable merchandise from consideration." Id. The fourth review, therefore, appears not to have afforded an "available" surrogate company that drew wire from wire rod in its production process.

In the fifth administrative review, Commerce appears to have selectively quoted its rationale from the fourth administrative review to justify selecting financial statements without regard to whether they drew wire from wire rod.[4] In the sixth administrative review here, Commerce mimicked its approach in the fifth administrative review, selecting financial statements from LS, Sahasilp, and Mongkol despite the fact that the record indicates that Sahasilp and Mongkol do not draw wire from wire rod in their production processes. See Decision Memorandum at 8-9. Unlike the fourth administrative review, however, here the record demonstrates that LS draws wire from wire rod in its production process, and like the fourth administrative review, Commerce could have simply used that one company to calculate its financial ratios. See U.S. Distributors' Case Brief at 15, PD 166 at bar code 3300332-01 (Aug. 24, 2015) (citing undisputed record evidence that LS draws wire rod in its production process as support for argument that LS's financial statement was the "best information on the record to calculate surrogate financial ratios"). Commerce, therefore, acted unreasonably by failing to adhere to its announced selection criterion without explaining why that criterion suddenly has no relevance. Commerce is in

---

[4] The court notes that the fifth administrative review is pending before the court, and also includes a challenge to Commerce's financial statement selection of the same companies chosen in the sixth administrative review. See Shanghai Wells Hanger Co. v. United States, 41 CIT ___, 211 F. Supp. 3d 1377 (2017) (remanding final results of fifth administrative review on surrogate country selection, and reserving decision on Plaintiffs' remaining arguments, including surrogate financial statement selection).

a tight spot. That important criterion underpinned surrogate value selections in prior

proceedings.

Defendant has great difficulty grappling with Commerce's unmistakable, consistent

emphasis of the importance of wire drawing in its surrogate data selection in prior

proceedings under this Antidumping Duty Order. See Def.'s Resp. 13-16. None of

Defendant's arguments is persuasive. Defendant argues that Commerce was not

obligated to continue emphasizing the importance of drawing wire from wire rod. Id. at 14.

Defendant is correct in the abstract that Commerce may change its mind, and adopt a

new practice or policy, but Commerce must provide a reasonable basis for the change.

In F.C.C. v. Fox Television Stations, Inc., 1556 U.S. 502, 515–16 (2009), Justice Scalia

explained:

> [T]he requirement that an agency provide reasoned explanation for its
> action would ordinarily demand that it display awareness that it <u>is</u> changing
> position. An agency may not, for example, depart from a prior policy <u>sub</u>
> <u>silentio</u> . . . the agency need not always provide a more detailed justification
> than what would suffice for a new policy created on a blank slate.
> Sometimes it must—when, for example, its new policy <u>rests upon factual</u>
> <u>findings that contradict those which underlay its prior policy; or when its prior</u>
> <u>policy has engendered serious reliance interests that must be taken into</u>
> <u>account</u>. . . . It would be arbitrary or capricious to ignore such matters. In
> such cases it is not that further justification is demanded by the mere fact of
> policy change; but <u>that a reasoned explanation is needed for disregarding</u>
> <u>facts and circumstances that underlay or were engendered by the prior</u>
> <u>policy</u>.

Id. (emphasis added).

In the fourth administrative review Commerce adhered to its selection criterion,

and noted and explained that it could not satisfy that criterion in that particular review

because of the limits of the administrative record. See Decision Mem.-AR4, at cmt. 2. Commerce did not all of a sudden abandon the criterion as incorrect or wrong. Id. Commerce has yet to explain in the sixth administrative review why that selection criterion established in the investigation and three subsequent administrative reviews was incorrect or wrong. Suffice it to say that Commerce has yet to provide a reasonable basis for its change in emphasis in the selection criterion, and its reliance on the fourth administrative review is inapplicable to the sixth administrative review, given the noted factual differences in the administrative records. See Final Results-AR4, and Decision Mem.-AR4, at cmt. 2.

Defendant also argues that even if Commerce unreasonably departed from its criterion that a surrogate company draw wire from wire rod, any such departure was harmless error as Commerce reasonably found that Sahasilp and Mongkol produced comparable merchandise given other record information. See Def.'s Resp. 14-16. Defendant fashions a weak circular argument predicated on Commerce's conclusions in previous reviews that fasteners, which are produced by Sahasilp and Mongkol, are comparable merchandise to wire hangers. Id. This circular argument fails for the very reason that underpins Plaintiffs' challenge on this issue: it was the process of creating fasteners by drawing wire from wire rod that reasonably led Commerce to conclude that fasteners and wire hangers are comparable merchandise. See, e.g., Final Results-Investigation and Decision Mem.-Investigation at cmt. 3, (discussing why wire fasteners are comparable merchandise to wire hangers primarily because both products require the drawing of wire from wire rod in their production process); Steel Wire Garment Hangers

from the People's Republic of China, 76 Fed. Reg. 27,994 (Dep't of Commerce May 13, 2011), and accompanying Issues and Decision Memorandum, A-570-918 (May 9, 2011), at cmt. 2, available at http://enforcement.trade.gov/frn/summary/PRC/2011-11871-1.pdf (last visited on this date) (explaining rejection of potential surrogate countries that produced fasteners where record did not include evidence that these companies consumed wire rod in their production process); Steel Wire Garment Hangers from the People's Republic of China, 77 Fed. Reg. 12,553 (Dep't of Commerce Mar. 1, 2012), and accompanying Issues and Decision Memorandum, A-570-918 (Feb. 23, 2012), at cmt. 4, available at http://enforcement.trade.gov/frn/summary/PRC/2012-4875-1.pdf (last visited on this date) ("We find that the various fasteners produced by the surrogate companies are comparable to steel wire garment hangers, the subject merchandise, because fasteners, like steel wire garment hangers, are a downstream product of wire requiring additional manufacturing processes." (emphasis added)); Steel Wire Garment Hangers from the People's Republic of China, 78 Fed. Reg. 28,803 (Dep't of Commerce May 16, 2013), and accompanying Issues and Decision Memorandum, A-570-918 (May 7, 2013), at cmt. I.D, available at http://enforcement.trade.gov/frn/summary/prc/2013-11682-1.pdf (last visited on this date) (supporting selection of financial statements from companies in the Philippines, noting that the companies produced comparable merchandise of nails and hangers because each company "produces its products by drawing its own steel wire rods").

The court remands this issue to Commerce to address reasonably the importance of drawing wire from wire rod as a surrogate company selection criterion. The most direct

and efficient way forward would appear to simply use the one company's statements (LS) that drew wire from wire rod, as Commerce did in the fourth administrative review.

### III. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that the <u>Final Results</u> are sustained, with the exception of Commerce's value-added tax deductions and calculation of surrogate financial ratios; it is further

**ORDERED** that the <u>Final Results</u> are remanded to Commerce to reconsider its value-added tax deductions and calculation of surrogate financial ratios; it is further

**ORDERED** the Commerce shall file its remand results on or before November 28, 2017; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files it remand results with the court.

_____/s/ Leo M. Gordon_____
Judge Leo M. Gordon

Dated: September 28, 2017
    New York, New York